## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**MATTHEW HENRY CANTRELL,**

     **Plaintiff,**

**vs.**                         **CIVIL ACTION NO. 2:20-CV-00467**

**ANDREW SAUL, COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  By Order entered July 9, 2020 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are "[Plaintiff's] Brief in Support of Complaint" and Defendant's "Brief in Support of Defendant's Decision". (ECF Nos. 11, 12)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for remand (ECF No. 11); **DENY** Defendant's request to affirm the decision of the Commissioner (ECF No. 12); **REVERSE** the final decision of the Commissioner; and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings for the reasons stated *infra*.

1

**Procedural History**

The Plaintiff, Matthew Henry Cantrell, (hereinafter referred to as "Claimant"), protectively filed his application for benefits on or about June 23, 2015, alleging disability since December 31, 2012 in pertinent part due to depression, anxiety, and panic attacks (Tr. at 15, 75-76, 283-289). His claim was denied initially and again upon reconsideration (Tr. at 137-147, 149-155). Claimant requested a hearing that was held on January 25, 2018 (Tr. at 52-72, 156-157); subsequently on May 29, 2018, an Administrative Law Judge ("ALJ") issued an unfavorable decision (Tr. at 109-124). On March 12, 2019, the Appeals Council granted Claimant's request for review (Tr. at 209-211), and remanded the case for further evaluation of his mental Residual Functional Capacity ("RFC") (Tr. at 130-131).

On remand, a hearing before a new ALJ, the Honorable Francine A. Serafin, was held on May 21, 2019 (Tr. at 36-50). On July 3, 2019, the ALJ entered an unfavorable decision (Tr. at 15-29) The ALJ's decision became the final decision of the Commissioner on June 3, 2020 when the Appeals Council denied Claimant's Request for Review (Tr. at 1-6).

On July 8, 2020, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9) Subsequently, Claimant filed a Brief in Support of Complaint (ECF No. 11), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 12), to which Claimant filed his Reply (ECF No. 13). Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 37 years old as of the alleged onset date, and determined to be a "younger person" throughout the underlying proceedings. See 20 C.F.R. § 404.1563(c). (Tr. at 27) Claimant has a high school education. (Id.) Claimant's past relevant work included a job as a cottage parent and as a host at Olive Garden restaurant. (Tr. at 45) Claimant has a history of substance abuse. (Tr. at 42-43)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims, 20 C.F.R. § 404.1520.  If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f).  By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. § 404.1520a(a).  First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c).  Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart P of part 404 of this chapter for more information about the factors we consider when we rate the degree of your functional limitation.

4

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter.

(4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

<u>Id</u>. § 404.1520a(e)(4).

**<u>Summary of ALJ's Decision</u>**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through June 30, 2022. (Tr. at 17, Finding No. 1) Next, the ALJ determined that Claimant had not engaged in substantial gainful activity since December 31, 2012, the alleged onset date. (<u>Id</u>., Finding No. 2)

At the second inquiry, the ALJ found that Claimant had the following severe impairments: depression; attention deficit hyperactivity disorder (ADHD); alcohol abuse; polysubstance abuse; obesity; and hypertension. (Tr. at 18, Finding No. 3)

At the third inquiry, the ALJ concluded that Claimant's impairments or combination thereof did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 19, Finding No. 4) The ALJ then found that Claimant had the RFC to perform medium work

> except he can only occasionally climb ladders, ropes, scaffolds, ramps, or stairs, balance, stoop, kneel, crouch, and crawl. The claimant is capable of simple routine repetitive work that is not at an assembly line or production rate pace. He is capable of tolerating only a few changes in the work environment, defined as three to four changes per workday or work shift. The claimant is capable of occasional interaction with co-workers, supervisors, and the public.

 (Tr. at 21, Finding No. 5)

At step four, the ALJ found Claimant was not capable of performing his past relevant work. (Tr. at 27, Finding No. 6) Noting that in addition to the immateriality of transferability of job skills, Claimant's age, education, work experience and RFC, the ALJ determined there were other jobs that existed in significant numbers in the national economy that Claimant can perform, such as warehouse stock selector, sorter, and laundry worker. (Tr. at 27-28, Finding Nos. 7-10) Finally,

the ALJ determined Claimant had not been under a disability from December 31, 2012 through the date of the decision. (Tr. at 28, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

In support of his appeal, Claimant asserts that the ALJ erred by finding he remains capable of substantial gainful activity despite his severe mental impairments which show he is unable to remain on task. (ECF No. 11 at 3-6, 8) Claimant contends that the ALJ's mental RFC is also erroneous to the extent it limits Claimant to occasional interaction with co-workers, supervisors and the public because Claimant is unable to interact meaningfully with others since the record is replete with evidence that he has delusional thoughts. (Id. at 7-9) Claimant disputes the ALJ's finding that he has only moderate deficiencies in concentration, persistence and pace, and mild deficiencies in adapting or managing oneself. (Id. at 9) Claimant seeks remand for proper consideration of his mental impairments as well as an assessment that his being off-task may meet or equal a Listing. (Id. at 10)

In response, the Commissioner argues that Claimant's mental impairments did not meet or equal Listing criteria, despite any evidence his impairments met or equaled some criteria, because all criteria must be met. (ECF No. 12 at 10-14) Additionally, Claimant's argument concerning Listing criteria is essentially a request that this Court re-weigh the conflicting evidence of record in order to obtain a different result. (Id.) The Commissioner also argues that the ALJ's RFC assessment was proper, and the result of the ALJ's review of all the relevant evidence, including Claimant's testimony, statements, objective medical records, the consultative evaluation, the opinion evidence, and other evidence of record; again, Claimant's disagreement with the ALJ's findings in the functional areas of concentration, persistence and pace and adapting or managing

7

oneself is not only based on Claimant's misunderstanding of the current legal authority, but also is a request this Court re-weigh the evidence. (Id. at 14-19) Finally, the Commissioner states that the final decision is supported by substantial evidence and asks this Court to affirm. (Id. at 20)

In reply, Claimant contends that the ALJ's mental RFC assessment is deficient in several respects: first, the evidence is clear that Claimant is incapable of staying on task and the evidence is undisputed that he does little, if any daily functional activities – there is no evidence he is capable of paying bills, organizing and consuming his medications as prescribed or living independently in any form. (ECF No. 13 at 2) Claimant also argues that the ALJ fails to address whether Claimant was capable of short repetitive tasks, but only determined that he was capable of simple, routine, repetitive work. (Id. at 3) Finally, Claimant asserts the RFC also fails to address and the ALJ fails to explain "minimal" interaction with the public. (Id. at 4)

## The Relevant Evidence of Record[1]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

### Mental Health Treatment:

Prior to the relevant period, Claimant began treatment at the Prestera Center for his mental health complaints (see, e.g., Tr. at 611-622). Claimant was often referred for group therapy but refused this treatment or other anxiety medications (Tr. at 537, 545, 553, 619, 633, 1578). At appointments with Victor Nease, M.D., and other Prestera providers through March 2017, Claimant generally presented an appropriate or casual appearance; direct or normal eye contact; cooperative behavior; normal or calm motor activity; normal speech; good concentration/attention;

---

[1] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

intact memory; appropriate affect; no hallucinations; goal directed, logical, or appropriate thought content; and relevant or intact thought process (no delusions)  (Tr. at 537, 545, 547, 553, 555, 561, 563, 571, 581, 583 624-625, 629-630, 633-634. 1574, 1579). He occasionally displayed an anxious mood (Tr. at 537, 545, 553, 561).

At these appointments, Claimant often reported: that he felt better and had a fairly stable mood (Tr. at 629); that his medication helped and his mood was fair (Tr. at 633); that work was going better and less stressful (Tr. at 545); that he had some relief with Xanax and his mood was good (Tr. at 553); that he was "fine" and only required his medication (Tr. at 569); that his mood was overall good (Tr. at 579); and that his anxiety was fairly well controlled with Xanax (Tr. at 1573). On one occasion, Claimant had left home without his medication; he reported doing better once he restarted it (Tr. at 579). He was compliant with medication at times though he admitted, on occasion, taking more Xanax than prescribed (compare Tr. at 569, 579, 653, 658, 1573, with Tr. at 607, 1578). In terms of activities, Claimant reported that he worked as a host at Olive Garden up to thirty hours per week and that work was going well and was less stressful (Tr. at 537, 545, 579, 607, 625).[2]

Claimant sought additional psychiatric treatment at the CAMC Family Medicine Center beginning in September 2017, requesting to see a new psychiatrist (Tr. at 1119). He reported paranoid delusions that someone was being paid to follow him; that people were trying to take baths in his home; he posted things on Facebook that he did not remember; that he does not sleep several days at a time; that he is gambling a lot; and that he had grandiose thoughts about being the President or in the CIA (Id.). On examination, Claimant was awake, alert, oriented, and

---

[2] From treatment records dated December 19, 2013, April 4, 2014, May 7, 2015, May 21, 2013, April 23, 2013.

cooperative, with an appropriate mood or affect (Id.). He was referred to behavioral medicine (Tr. at 1161).

The next month, on October 18, 2017, Claimant reported to the CAMC Family Medicine provider that he had been taking diazepam, drinking one-and-a-half pints of liquor per day, and drinking until he "get[s] crazy and pass[es] out" (Tr. at 1161). He stated that if he did not get benzodiazepines, he would just go home and drink (Tr. at 1162) He claimed that a political mob was after him; he also claimed that he was friends with Donald Trump, and that he could have run for president, but Trump talked him out of it so he could run himself, but he could have won this year (Tr. at 1161) He reported that he worked at Olive Garden and knows political people and rock stars; he studies for the CIA and political jobs at home; he described being overwhelmed at times by how many "famous people" he "knows." (Id.). On examination, Claimant had an anxious appearance; poor eye contact; fast, pressured, and interrupting speech; flight of thoughts; and tangential thought process (Tr. at 1162). Claimant's provider told him that mixing alcohol and benzodiazepines could cause death, so he refused to prescribe benzodiazepines (Tr. at 1163). Claimant declined emergent treatment (Id.). When Claimant presented for emergency treatment the next day, he was cooperative, alert, and oriented, with an appropriate mood and affect (Tr. at 1374). He did not exhibit signs of mania, and he said he simply wanted help for his alcohol dependence and was concerned about benzodiazepine withdrawal (Tr. at 1372).

On October 27, 2017, Claimant reported to his primary care provider at CAMC that he had missed his behavioral health appointment and was not sure he wanted to follow up (Tr. at 1197). He reported that he was not taking any medication right now and went to the emergency department for his anxiety and received a few diazepam pills and had already taken them; he was

currently drinking a pint of liquor per day (Tr. at 1054, 1197-98). Claimant presented as alert, oriented, and cooperative, with an appropriate mood and affect (Tr. at 1055, 1198).

At Claimant's next appointment in June 2018, he saw Jeffrey Ashley, M.D., for a routine follow up (Tr. at 1793). Claimant reported that he was filing for disability for anxiety but did not want medication or to see a psychiatrist (Id.). He was not taking medications as recommended (Id.). He told Dr. Ashley that he "would rather stay home and get disability than to take medications and attempt to get a job. Says working is not for him and not willing to discuss options for treatment such as psych, medications, or workup" (Id.). Claimant had difficulty staying on topic and interrupted to talk about a Mexican cartel (Id.). Claimant was still using recreational drugs such as meth and requested narcotic pain medication (Id.). On examination, Claimant had a tangential thought process, loud tone, and was interruptive (Tr. at 1794). Dr. Ashley felt Claimant was in need of a mental health referral and explained that he needed a psychiatric evaluation to be considered for disability (Id.). Although Dr. Ashley stressed the importance of Claimant seeing behavioral medicine but Claimant refused (Id.).

Emergent Care:

Claimant also sought mental health treatment at the emergency room ("ER") at Thomas Memorial Hospital ("Thomas") and Charleston Area Medical Center ("CAMC"). In July 2014, he presented to Thomas after he "drank too much" and got "knocked" around (Tr. at 499). When he arrived at the hospital, he presented as "delusional with bizarre behavior. Patient refuses to give any information for triage. Keeps talking about Mexican cartel and the mob." (Tr. at 452, 494). It was noted that Claimant "appears to have altered thought processes, verbalized as delusions. Appears agitated, angry and bizarre . . . Patient is verbally threatening staff, including cursing

and shouting . . . Patient found in waiting room after going to the bathroom." (Tr. at 453) He claimed that he "was walking down the street tonight when he was mugged by the deputy sheriff, Mexican drug cartel, and the mob. [H]e reports they are all interrelated and are plotting against him and his family." (Tr. at 494) He also claimed the cartel stole his Xanax (Tr. at 495). The ER doctor felt most of Claimant's paranoia and odd behavior were the result of an assault and emotional distress (Tr. at 496).

Claimant also made trips to the ER as well as to his primary care physician to request Xanax (Tr. at 391-392 (April 2015), 694-695 (May 2015), 1310 (September 2017), 1366, 1440 (October 2017); see also Tr. 1010 (seeking Xanax from primary care physician)). On one occasion, the provider noted Claimant's drug-seeking behavior (Tr. at 392). At other times, Claimant admitted to mixing his medication with up to four pints of liquor per day (Tr. at 1371-1372, 1666, 1675). Claimant was told he would not be provided refills while abusing alcohol (Tr. at 1395).

Claimant also received ER treatment for alcohol abuse with intoxication in January 2018 (Tr. at 1666). He reported that he had consumed four pints of liquor in the past 24 hours along with one strip of Suboxone (Tr. at 1675, 1688). He sought assistance to enter rehab for alcohol abuse (Tr. at 1703).

Psychological Consultative Evaluation Report:

On January 11, 2016, Claimant attended a psychological consultative examination with Ernie Vecchio, M.A. (Tr. at 668-674). Mr. Vecchio felt Claimant was a poor historian, noting, for example, that Claimant made inconsistent statements regarding drug use, stating both that he had not used drugs and that he last used drugs a month earlier (Tr. at 669-670). When asked why he could not work, Claimant discussed his physical issues and went off topic (Tr. at 669). Mr. Vecchio

noted: "(*There is no way to represent in this writing the number of times [Claimant] expands, goes off topic, and has difficulty expressing his thoughts in a sequential manner. The length of the exam is doubled as half the time is spent refocusing his responses.)" (Id.) Claimant reported a depressed mood, diminished interest in activities, and difficulty thinking, concentrating, or remembering (Tr. at 672). However, Claimant also reported working at Olive Garden five to ten hours per week, watching television, spending time on Facebook, and laying around at night (Tr. at 670, 672).

On examination, Claimant presented as anxious, rapidly speaking, and with tangential thinking (Tr. at 668, 670). However, he was also cooperative throughout and had normal social behavior other than needing to be refocused throughout the evaluation (Tr. at 670). His stream of thought was noted to be consistent with thought disorder, including derailment, tangents, perseveration, and thought blocking (Id.). He was unable to focus or respond in a sequential fashion unless interrupted (Tr. at 671). Claimant's insight was poor, but he had normal judgment, no reported perceptual issues, and no suicidal or homicidal ideation (Id.). On memory testing, Claimant recalled four words immediately; one of four words after a thirty-minute delay; and was mildly deficient in reporting his personal history (Id.). Mr. Vecchio felt Claimant's concentration was severely deficient based on a digit span score, but his persistence was only mildly deficient and his pace within normal limits (Id.).

Mr. Vecchio diagnosed cannabis abuse, cocaine abuse, major depressive disorder (mild), and attention deficit hyperactivity disorder ("ADHD") (Tr. at 672).

State Agency Psychological Consultant Opinions:

In January 2016, John Todd, Ph.D., reviewed the record and opined that Claimant had mild

restriction of activities of daily living and in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration (Tr. at 81-82). Dr. Todd then opined that Claimant was able to learn and perform short, simple, repetitive type one-to-three step tasks; attend for short repetitive type tasks; and required few changes but may require additional time to learn new tasks (Tr. at 86-87). He further noted that Claimant was "not significantly limited" in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. at 87). In May 2016, Paula J. Bickham, Ph.D., affirmed Dr. Todd's assessment of the four functional areas (Tr. at 98).

**The Administrative Hearing**[3]

Claimant Testimony from January 25, 2018:

When asked about his prior work as midnight security at a state youth facility, Claimant testified that the job consisted of doing half-hour bed checks for six residents and transporting them for weekly drug tests (Tr. at 57). He stated the job was emotionally damaging and isolating to him (Tr. at 58, 59). He endorsed fear that the residents would try to kill him, by poison or getting beat up because a few times a resident threatened to push him down the stairs (Tr. at 58). Claimant testified that he started to get paranoid (Id.).

Claimant also indicated a concern that residents' families would not like him being in charge of them at night because he was younger than the other "house parents" (Id.). Claimant

---

[3] Claimant refers to his testimony from the prior hearing in this case in support of his arguments raised in this appeal. Accordingly, the undersigned reviews the testimonies from both hearings, with a focus on Claimant's mental conditions and past relevant work.

described some residents coming from wealthy families in Detroit; that he watched TV and sit on the couch all the time; that he had no social life; that he slept during the day; that his first jobs were working in cemeteries and that "started to mess with me mentally" (Id.). Claimant went on to say:

> I didn't realize that even what we were doing, they were saying, you know, we're cold-calling right out of the book and I didn't even realize it until the past few years that they were calling people about death and, you know. And I felt like they made movies later about what I would talk about, you know. I mean I've always been into some form of entertainment with other friends and they would talk about me behind my back. I've had visions of digging my way out of bodies and just goraphobic [sic] stuff from all the movies I've seen. And then I had a stepdad that was a Marine. I had a brother that was a Marine. My real dad is Navy, so it's always been like a military effect there and - -

(Tr. at 58-59) After being redirected by the ALJ, Claimant confirmed that he left the job; he stated that it was operated by Patch Work, Daymark and Turning Point and that he worked there for seven years (Tr. at 59-60). In response to questions by his attorney, Claimant testified that he had known his attorney and family since they were three years old (Tr. at 63). He admitted that Claimant's attorney's stepfather was the executive director at Daymark and helped him get the job, and that he accommodated Claimant so that he could keep the job for several years (Id.). Claimant described the "accommodate[ion]" as being offered to work nights because Claimant got certification in computers, but he didn't like them; Claimant also testified that he was living in his attorney's mother's basement when he worked at the cemetery (Tr. at 64). Claimant also stated that he had lived rent-free in a corner room in his attorney's father's barn; he helped with feeding some of the animals on the farm (Tr. at 64-65).

When describing his job at Olive Garden, Claimant testified that "[a]t first it was, it was entertaining, it was getting to be around people. But I was studying to be a hypnotherapist, I was thinking about going and joining the CIA at one point. And I was using redirection socially with

the servers and, you know. It was almost experimental in some states." (Tr. at 60) After being redirected by the ALJ again, Claimant testified that while working at Olive Garden, he initially got 40 hours, but "then I figured out that I would get more back on my taxes if I worked 36 hours on the check. So I maintained 36 hours because I would get more cash back at the end of the week." (Id.) When asked if he would maintain 36 hours per week, Claimant responded that towards the end of [his working at Olive Garden], it became "embarrassing" for him because he was made fun of a lot and people would "grab" him and even hit him on the back of the head with a stack of menus. (Tr. at 60-61) He continued, "[a]fter a while I started to, you know, I always studied religion and war, and I felt as if I was even developing my own religion and then people started to take it seriously. And then it felt like it started to become almost like a terrorist following. I felt terrorized a lot of times leaving, people would almost get hit walking off the hill with me by cars." (Tr. at 61) Claimant stated that he was let go from Olive Garden in March 2017; he tried to obtain employment at Longhorn, another restaurant operated by Darden, but "they were stringing me along to where I didn't have money to make it out there with my vehicle. So I had no other choice but to go apply at O'Charley's. And then I was getting physically hit by servers." (Id.)

Claimant testified that he felt he could not work because in addition to physical problems, he said that he was mad all the time, depressed, and he "can't stop crying." (Tr. at 62) He also stated that when he goes out, "there's a following and I get harassed and there have been times where I've been beat up." (Id.) Claimant also stated he had anxiety attacks, which he described as having trouble breathing where he would usually leave a room to go hide in a bathroom. (Tr. at 65) Claimant testified that he probably was able to work at Olive Garden because he was able to get away from people when he "didn't feel like a person really[.]" (Id.) Claimant spoke of having

relationship problems with women, verbal abuse, and having people go to him whenever their parents would die or someone needed help out of a relationship, to having guns pulled on him, to being physically attacked, and that he liked being able to help people. (Id.) He described getting into a blind rage with people and yelling when he felt threatened and preferred to stay by himself. (Tr. at 65-66) He stated he wanted to move to Virginia to be near his family and friends and that he had an interview at Red Lobster, but he didn't want to go because he didn't want to ride the bus because of the harassment. (Tr. at 66) He felt like he was being followed all the time (Id.) He has had anger episodes with his family or friends where he would cuss them and threaten them, but he does not know why. (Tr. at 66-67)

Claimant opined that despite his problems with interacting with people, he was able to work at Olive Garden because he only had to deal with people for about fifteen seconds at a time. (Tr. at 67) He said could not full time because then he discovered he got more on his paycheck by only working 36 hours. (Id.)

Claimant Testimony from May 21, 2019:

Claimant testified that since he became disabled in 2012, he had worked part time at Pizza Hut; he had problems working that job due to transportation and location, also with his memory and taking orders and multi-tasking. (Tr. at 40-41) He had some problems with others at the workplace, that some younger servers were taking his tables, and managers not wanting him on the floor, plus his hours were being cut. (Tr. at 41) He thought his hours were getting cut because he couldn't recall orders or multi-task. (Id.)

Claimant stated that he lived on his own, and did not bathe for two months because of water issues. (Id.) He said his family members pay his bills. (Tr. at 41-42) He still feels as if people are following him and conspiring against him. (Tr. at 42)

In response to questioning by the ALJ, Claimant admitted to smoking marijuana, but he couldn't be sure if it was because he hadn't tested positive for anything. (Tr. at 42-43) He said he did not "really have a problem with that kind of stuff." (Id.) Claimant stated that he drinks alcohol occasionally on the weekends, but it is not a problem. (Tr. at 43) He denied using cocaine in the past, because he could not confirm that it was cocaine, as he was not tested for that. (Id.)

Vocational Expert ("VE") Testimony:

After listening to Claimant's testimony, the VE considered a couple hypothetical questions posed by the ALJ with regard to an individual with Claimant's functional profile (Tr. at 45-47). The VE then testified that an individual of Claimant's age, education, and vocational background who had Claimant's limitations as described in the RFC, *supra*, could not perform Claimant's past work but could work as a warehouse stock selector, sorter, or laundry worker. (Tr. at 46-47). The VE further stated that if the individual were to be off task for 15% or more of the workday, then there would be no work available. (Tr. at 47)

In response to questioning by Claimant's attorney, the VE testified that if the individual were restricted to less than occasional interaction with the public, the same jobs would remain. (Id.) However, the VE opined that anything less than occasional interaction with supervisors and co-workers would not fit unskilled work. (Tr. at 48) The VE clarified that when assessing the off-task percentage, she applied it to full-time work, a 40-hour week. (Tr. at 49)

**Scope of Review**

18

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**<u>Analysis</u>**

As noted *supra*, Claimant disagrees with the ALJ's RFC assessment as it relates to his limitations stemming from his mental impairments, because the medical records and his testimonies are consistent to the extent that this evidence shows he has significant functional limitations with respect to his ability to remain on task and/or ability to concentrate long enough to sustain work activities in an ordinary work setting on a regular and continuing basis.

<u>Consideration of the Record Concerning Mental Health Issues at Step Three:</u>

Claimant bears the burden of proving he has an impairment or combination of impairments

that meets or medically equals the severity of Listing requirements. See Bowen v. Yuckert, 482

U.S. 137, 146 n.5 (1987).[4]

The Regulations provide:

In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

See 20 C.F.R. § 404.1523(c). When confronted with a combination of impairments, an adjudicator

must not only acknowledge "the existence of the problems, but also the degree of their severity,

and whether, together, they impaired the claimant's ability to engage in substantial gainful

activity." Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974). The Fourth Circuit has held that

the ailments should not be fractionalized and considered in isolation, but considered in

combination to determine the impact on the ability of the claimant to engage in substantial gainful

activity. Id. In short, the ALJ must analyze the cumulative or synergistic effect that the various

impairments have on Claimant's ability to work. DeLoatche v. Heckler, 715 F.2d 148, 150 (4th

Cir. 1983).

"The Listing of Impairments . . . describes for each of the major body systems impairments

that we consider to be severe enough to prevent an individual from doing any gainful activity,

regardless of his or her age, education, or work experience." See 20 C.F.R. § 404.1525(a); Sullivan

---

[4] The Supreme Court noted:

The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

v. Zebley, 493 U.S. 521, 532 (1990). To qualify for benefits, Claimant must show that his combination of impairments is "equivalent" to a listed impairment, and he "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." See Id. at 531. Claimant must meet all, not just some, of the criteria for a listing to apply. Id. at 530.

Pertinent to the issues on appeal, at the third step of the sequential evaluation process, the ALJ evaluated Claimant's polysubstance and alcohol abuse according to Social Security Ruling ("SSR") 13-2p.[5] (Tr. at 19) He noted that Claimant had diagnoses of cocaine abuse, cannabis abuse, Benzodiazepine (benzo) misuse, and alcohol abuse, but despite these impairments, "including his drug and alcohol addiction", a materiality finding need not be determined under the Ruling. (Id.)

With regard to Claimant's mental health issues, the ALJ considered the opinion evidence provided by the state agency psychological consultants, and while acknowledging that they reviewed the record on January 14, 2016 and May 11, 2016, the ALJ gave their opinions little weight, as the criteria for evaluating mental health conditions had changed since then, and the evidence showed that Claimant was more restricted, specifically in his ability to interact with others. (Tr. at 19-20)

The ALJ found Claimant had mild limitations in understanding, remembering, or applying information based on the following evidence: Claimant alleged memory problems (Tr. at 20, 337)[6]; during the psychological consultative examination Claimant demonstrated severely deficient recent

---

[5] See, "SSR 13-2P.; Titles II and XVI: Evaluating Cases Involving Drug Addiction and Alcoholism (DAA)", 2013 WL 621536 (effective March 22, 2013). As noted by the Commissioner, because the ALJ determined that "when considering all of Claimant's impairments, including his drug and alcohol addiction", Claimant was found not disabled at step three, therefore, "drug addiction and alcoholism (DAA) materiality finding does not need to be determined." (ECF No. 12 at 17, n.9; citing Tr. at 19) See 2013 WL 621536, at *5.

[6] The ALJ referred to Claimant's Function Report submitted in September 2015.

memory, mildly deficient remote memory, normal immediate memory (Tr. at 20, 671); and Claimant's memory was noted to be intact throughout the record (Tr. at 20, 536-663, 1573-1582)[7].

Next, the ALJ found Claimant had moderate limitations in interacting with others, noting: Claimant told his psychiatrist that his best friend was his representative/attorney (Tr. at 20, 623); the psychological examiner found Claimant's social functioning within normal limits (Tr. at 20, 672); and Claimant worked as a host greeter at a restaurant for several years during the relevant period.

Regarding his abilities in concentrating, persisting, or maintaining pace, the ALJ determined Claimant had moderate limitations, again relying upon the psychological examiner's finding that his concentration was severely deficient, his persistence mildly deficient and his pace within normal limits. (Tr. at 20, 671) In addition, the ALJ noted Claimant's daily activities included watching television and using Facebook, "both of which would need some concentration to do for most of the day (Tr. at 20, 672); also, the ALJ observed that another provider noted Claimant had normal concentration (Tr. at 20, 1584)[8].

Finally, in adapting or managing oneself, the ALJ determined the evidence showed Claimant had only a mild limitation: while acknowledging Claimant alleged in his Function Report that he was unable to pay bills because he was too disorganized (Tr. at 20, 335), the ALJ noted that he reported no issues with personal care and was capable of preparing simple meals and maintaining part-time employment for several years since his alleged onset date (Tr. at 20-21, 333, 317-324, 332-339). Further, the ALJ noted that on examinations in treatment records and at the consultative

---

[7] The ALJ referred to treatment records from Prestera Center dated February 16, 2012 through May 7, 2015 and October 6, 2016 through March 30, 2017.

[8] The ALJ referred to a treatment record dated September 19, 2017 from Darshan Dave, M.D., of the Neurology & Headache Clinic PLLC.

psychological examination, the record showed that Claimant had adequate grooming and appropriate dress (Tr. at 21, 536-663, 668-674).

Claimant has emphasized the ALJ's findings described *supra* are not supported by substantial evidence because of numerous instances in the record actually support greater limitations in these functional areas. However, this Circuit has recognized that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" <u>Reid v. Comm'r of Soc. Sec.</u>, 769 F.3d 861, 865 (4th Cir. 2014) (quoting <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*)). Instead, an ALJ " 'must build an accurate and logical bridge from the evidence to his conclusion.' " <u>Monroe v. Colvin</u>, 826 F.3d 176, 189 (4th Cir. 2016) (quoting <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000)). In this case, the ALJ provided more than sufficient citations from the record that documented Claimant's deficiencies (or lack thereof) as they relate to the four broad areas of functioning. While Claimant disagrees with this outcome, it is clear that the ALJ reconciled the conflicting evidence of record, and this Court cannot re-weigh this conflicting evidence or substitute its judgment for the Commissioner's. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996); <u>see also</u>, SSR 96-8p, 1996 WL 3741784, at *7.

Accordingly, the undersigned **FINDS** the ALJ's rating the degree of functional limitation from Claimant's mental impairments is supported by substantial evidence. The undersigned further **FINDS** that the ALJ's third step analysis and conclusions concerning Claimant's mental impairments did not meet Listing requirements are also supported by substantial evidence.

<u>The RFC Assessment and Fifth Step Finding:</u>

Claimant argues that the RFC assessment is not supported by substantial evidence because it fails to address his being off-task during a normal workday as a result of his mental impairments. (ECF No. 11 at 8, 10-11)

The Fourth Circuit "has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). It is noted that when the evidence is deemed sufficient in order to render a disability determination, an adjudicator need not order a consultative examination, and that such decisions are within the ALJ's discretion. See 20 C.F.R. §§ 404.1519a, 404.1519b. Of interest here, is that this case was remanded once by the Appeals Council because among other things, further evaluation of Claimant's mental impairments as well as consideration of his maximum RFC during the entire period was necessary. (Tr. at 15, 129-133) In addition, the Appeals Council directed, if warranted, that "hypothetical questions should reflect capacity/limitations established by the record as a whole" and to "take further action needed to complete the administrative record". (Tr. at 131) The undersigned further notes that Claimant indicated in a September 2015 Function Report that he worked "only a few hours per week" and would go to work "one or two times per week at most." (Tr. at 333, 336)

It is significant that the ALJ found Claimant was incapable of doing his past work at step four, and pursuant to the pertinent Regulations, *supra*, Claimant made a *prima facie* showing of disability, therefore, the burden of going forward with the evidence shifted to the ALJ. McLain v. Schweiker, 715 F.2d at 868-69. The undersigned is mindful that this Circuit has long since held

that hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).

Nevertheless, it appears that Claimant's ability to engage in part-time employment for several years during the relevant period, though below substantial gainful activity levels, had persuaded the ALJ that Claimant was capable of *full-time* employment despite his impairments. It is also notable that the opinion evidence in this case was given during the period when Claimant remained employed part-time. Although it is undisputed that Claimant worked part-time, albeit very infrequently per his statements in his Function Report, *supra*, it is unclear how the ALJ determined he was capable of sustaining his focus, concentration, persistence, or pace necessary for full-time, at 40-hours per week, work. It is also relevant that there is no inconsistency between Claimant's problems with concentration/focus and delusional thinking and the record at large. Though it is also clear from the record that Claimant failed to follow prescribed medical treatment there is also no dispute that Claimant consistently abused alcohol and/or illicit drugs or misused his prescribed medication throughout the relevant period (i.e., Tr. at 22, 23, 24, 25, 26, 619, 387, 633, 537, 430-535, 391-392, 392, 1044-1225, 1601-1732, 1733-1805) – however, it is significant that Claimant convinced himself that he made more money by working less than full-time (Tr. at 60), but also testified that he received less hours due to his inability to remember orders and to multi-task (Tr. at 41).[9] While the ALJ points to Claimant's ability to perform certain daily

---

[9] The record also raises the question as to whether the undisputed evidence surrounding Claimant's delusional thought processes and inability to remain on task are even the cause of or at least contributing factors towards Claimant's failure to follow prescribed medical treatment – it appears from the evidence of record that these patterns of behavior or conduct are so intertwined that it is difficult to discern which causes or affects the other. In any event, this conundrum does not appear to have been explored by the psychological consulting examiners or experts. Indeed, Mr. Vecchio opined Claimant's prognosis was "poor" and he found Claimant to be only "marginally capable of managing his finances" (Tr. at 672, 673). While the undersigned recognizes that the RFC is a determination solely relegated to the adjudicator and need not rely upon a medical opinion for such an assessment (See, e.g., 20 C.F.R. § 404.1546), it

activities, such as "watching television" and "he was mostly on Facebook" as indicators that Claimant was capable of "some concentration to do for most of the day" (Tr. at 20), the ALJ's conclusion that these activities demonstrate Claimant is capable of work at substantial gainful activity levels is unsupported by the record. See Arakas v. Commissioner, Social Security Administration, 983 F.3d 83, 101 (4th Cir. 2020) (citing Lewis v. Berryhill, 858 F.3d 858, 868, n.3 (4th Cir. 2017) (quoting Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."))). In short, though the ALJ acknowledged Claimant's daily activities, there is a deficiency in the assessment as to the extent Claimant was able to perform them, and how this translates into the conclusion that Claimant remained capable of substantial gainful activity. See, generally, Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (internal citation omitted).

Moreover, the record shows that Claimant appeared before two different ALJs, both of whom had to frequently redirect Claimant to focus on the questions presented because Claimant was seemingly incapable of remaining on-task just long enough during the administrative hearings to discuss why he was applying for disability benefits – this evidence tends to indicate that Claimant's ability to remain on-task long enough to sustain substantial gainful activity levels is questionable and was not adequately addressed in the most recent RFC assessment.[10] This needs to be explored in order to provide a more appropriate RFC determination, particularly in light of Claimant's symptoms resulting from his mental impairments, which have remained consistent throughout the underlying proceedings.

---

nevertheless begs the question as to what this Claimant is capable of despite his mental impairments under the particular circumstances demonstrated in the case at bar.

[10] See, e.g., Mascio, 780 F.3d at 638 (citing Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011) ("the ability to perform simple tasks differs from the ability to stay on task.").

In short, despite the ALJ's narrative of the record of the objective medical evidence, and the other evidence of record, including Claimant's own statements and testimony, his ultimate determination that Claimant remained capable of simple, routine, repetitive work at substantial gainful activity levels is without sufficient explanation allowing for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). In short, the undersigned must "guess how the ALJ arrived at his conclusion" that this Claimant was capable of full-time work when the underlying and undisputed evidence indicated that Claimant's mental impairments prevented him from maintaining substantial gainful activity since December 2012; therefore, remand is necessary to resolve this query. Mascio, 780 F.3d at 637.

Finally, the undersigned **FINDS** that the Commissioner's final decision determining that Claimant was not disabled is not supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's request for remand (ECF No. 11), **DENY** the Commissioner's request to affirm the decision below (ECF No. 12), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order to either obtain an updated mental evaluation or otherwise more fully ascertain whether Claimant's mental impairments preclude him from performing at substantial gainful activity level despite his limitations.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District

Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Goodwin, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: March 19, 2021.



Omar J. Aboulhosn
United States Magistrate Judge